FINNEGAN and others, Plaintiffs, vs. McGAVOCK, Defendant.
[Two appeals.]

*December 7, 1938—January 10, 1939.*

For the plaintiffs there was a brief by *Arnold, Caskey & Robson* of Beloit, and oral argument by *E. J. Caskey*.

For the defendant there was a brief by *Adams & Adams* of Beloit, and oral argument by *H. W. Adams* and *Allan W. Adams*.

WICKHEM, J.   On November 29, 1930, Hugh McGavock, father of all the parties to this action, was the owner of certain real estate in the city of Beloit.   The improvements upon the real estate consisted of buildings adapted to and used for the purpose of conducting a lumber and fuel business. On the above date McGavock leased the premises for a period of fifteen years at a monthly rental of $200 to McGavock Brothers, a partnership made up of himself and the defendant.   The lease contained the following provisions which are material to this action:

"The party of the second part hereby agrees to pay to the said party of the first part, his heirs or assigns, the said amount of rent at the several times above stated, during the continuance of this lease, and to keep said premises in good repair; . . . and to quit and deliver up possession thereof peacefully and quietly to the party of the first part, or his legal representatives, at the expiration of the term above stated, in as good condition as when received, the natural wear by reasonable use thereof and destruction by the elements and by fire excepted. . . .

"If the whole or any substantial part of the demised premises be destroyed or made unfit for occupancy or use, either by the elements, inherent defect or other like cause, the lessee, having exercised ordinary care as to such injury, shall be entitled to a complete or proportionate abatement of the rent afterwards accruing; he shall not have the right to quit or surrender possession, or be wholly relieved from the payment of future rent, except for such an injury as shall render the demised premises substantially unfit for the purposes of the lease. . . .

"This lease is subject to all the provisions of the partnership agreement this date entered into between the said Hugh McGavock and Thomas M. McGavock and all rights as to assignments, cancellations, and other provisions relating to this lease therein contained shall be considered a part hereof as fully as though incorporated herein. . . .

"The partnership shall keep all buildings and improvements in good repair at its expense."

The partnership continued until May 13, 1932, when it was dissolved by written agreement. Hugh McGavock assigned all his interest in the lease to defendant. The dissolution agreement contained the following paragraph:

"It is further agreed that in case it is necessary to make any additions or alterations or repairs upon any of the machinery used in conducting the said business by the said Thomas M. McGavock hereafter, that he, the said Thomas M. McGavock, shall furnish all the machinery that is needed at his own expense, and no part of the cost thereof shall be made against Hugh McGavock. In case of repairs, or other upkeep, have to be made upon any of the buildings covered by this agreement, the same shall be made at the expense of Thomas M. McGavock. In case it is necessary to make repairs of any nature, but not alterations, on the main office building, the same shall be paid for by Hugh McGavock. Thirty days' notice of such repairs shall be given Hugh McGavock by Thomas McGavock."

On January 3, 1933, Hugh McGavock and defendant stipulated in writing for a reduction of the monthly rental from $200 to $150 a month, and on May 12th, of the same year, Hugh conveyed title to the real estate in question to plaintiffs and defendant in equal shares reserving a life use to himself. He died December 23, 1935. Since the dissolution of the partnership, defendant has continued to operate a lumber and fuel business upon the demised premises. After the death of the father defendant paid plaintiffs a monthly rental equal to three fourths of the stipulated rental of $150. He failed to pay the rent due plaintiffs for the months of

May, 1936, to July, 1937, inclusive, and this action was commenced to recover this rent.

The defense asserted was that a coal elevator upon the demised premises became unfit and unsafe for occupancy and use on April 23, 1936, by reason of the elements, inherent defects, and other like causes, and that because it was essential to the operation of his fuel business, he was entitled to a complete abatement of the rent under the terms of the lease. By way of counterclaim defendant alleged damage to his business in the amount of $21,500 by reason of the unfit condition of the elevator. Plaintiffs put the counterclaim in issue by a reply.

The question in this case is whether, under the provisions of the lease, defendant was entitled to an abatement of his rent by reason of the fact that the coal elevator after April, 1936, was not fit for use and occupancy. This requires a determination whether under the facts the elevator had become so unfit for use "by the elements, inherent defect or other like cause." Plaintiffs contend that the elevator merely became unfit for use by reason of ordinary wear and tear, and general old age, and that what was intended to be covered by the lease was some sudden catastrophe, such as fire, wind, or the collapse from some defect of design. The defendant contends, (1) that the covenant to repair on the part of the lessee does not impose upon him any obligation or duty to engage in any major jobs of construction or reconstruction; (2) that the specific terms of the lease relieving defendant from making repairs where they result from natural wear and tear by reason of the reasonable use thereof or destruction by the elements or by fire so qualify the provision that the tenant shall repair as to clearly restrict it and specifically not to require the tenant to reconstruct the elevator; (3) that it is beyond question in this case that defendant exercised ordinary care in his use of the property.

From these premises defendant contends that the lease should be so construed as to avoid casting upon him an obligation to continue paying rent when the buildings on the leased premises without fault on his part have become obsolete and unusuable. To reach this construction defendant asserts that the term "elements" is literally as applicable to the slow process of attrition as to the sudden exertion of destructive forces by storm, cyclone, or fire.

We are satisfied that defendant's position cannot be sustained, and that the phrase "destroyed or made unfit for occupancy or use, either by the elements, inherent defect or other like cause," as it occurs in the abatement clause in the lease and when applied to the physical destruction or impairment of a building refers only to sudden catastrophic events such as fires, floods, or tornadoes, and not to slow deterioration of the structure produced by heat, cold, rain, and other manifestations of normal and usual weather conditions. In this connection, care should be taken to distinguish between three standard situations in the relation of landlord and tenant in which this question becomes material.

(1) The question may arise upon surrender under a lease which, like the present one, obligates the tenant to surrender the premises in as good condition as when received "natural wear by reasonable use thereof and destruction by the elements and by fire excepted." In such a case the plain purpose is to release the tenant from all claims for damage arising out of reasonable wear and tear and the action of the elements upon the building whether gradual and deteriorating or sudden and destructive. The reason for inserting such clauses and the normal and proper construction of them is that the tenant's duty of surrender should be considered to have been discharged when the property redelivered to the lessor has been subjected to ordinary use and given ordinary care by the tenant, and that all other risks

which may result in surrender of the property in impaired physical condition should properly be borne by the lessor. Illustrative of this situation is the case of *Van Wormer v. Crane,* 51 Mich. 363, 365, 16 N. W. 686, 47 Am. Rep. 582. There the provision in the lease was that the lessees "will, at their own expense, during the continuance of the lease keep the said premises and every part thereof in as good repair and at the expiration of the term yield and deliver up the same in like condition as when taken reasonable use and wear thereof and damages by the elements excepted." The building on the demised premises was destroyed by fire, the cause of which was accidental and without traceable fault. The question put to the court was whether damages by the elements included merely acts of God, such as storms, lightning, and the like, or whether it included accidental destruction not wholly caused by the action of the elements. The court adopted the broader rule of construction and stated that the surrender clause properly construed applied to relieve the tenant of any duty to make good the loss of the building. In the course of the opinion, Justice COOLEY said:

" 'Damages by the elements' must be conceded to be a somewhat uncertain expression. Strictly speaking, the elements are the ultimate, undecomposable parts which unite to form anything; as the gases which form air and water are the elements respectively of those substances. But the term is used in many other senses, and the definitions of lexicographers would be of little service to us in this case.

"Anciently it was supposed there were four elements of material things—earth, air, fire, and water; and when it came to be known that this classification had no scientific basis, the term had found a place in common speech which it still retains. Injuries to buildings by wind, rain, frosts, and heat are spoken of as injuries by the elements, and all the ordinary decay from natural causes is classed in the same category. Probably no one would make any question respecting this.

"The injury in this case was caused by fire. No fault in connection with it is charged upon the defendants, and it

seems to be taken for granted on both sides that the fire was accidental. We may therefore assume that the fire was one which occurred without traceable fault, and that it is to be classed as a calamity for which no one is responsible except as he may have expressly undertaken to be so.

"If a flood had destroyed this building the defendants would not be held responsible, because it would have been said the damage is of a sort that must be referred to the elements within the understanding of the parties in entering into this covenant. If a tornado had destroyed it, the same would have been said. We cannot suppose the parties intended to except natural and ordinary decay from wind and rain, and not the more sudden and grievous calamities proceeding from the same sources. The general expression 'damages by the elements' will cover all such injuries if it will cover any of them. But an injury by fire is as much an injury by the elements as an injury by wind or flood, and we should be at a loss for any ground on which to distinguish it under this covenant."

See also *Leahy v. Wenonah Theatre Co.* 251 Mich. 594, 232 N. W. 184.

(2) the second class of cases is quite similar to the first and deals with the obligation to replace or reconstruct. By reasonable construction of the lease or by a clause expressly to that effect, a tenant may have no duty whatever to reconstruct buildings that without his fault have collapsed or been rendered useless or untenantable by reason of ordinary wear or by some sudden and unexpected calamity such as fire or tornado. Here also exculpatory clauses are reasonably construed to include all destructive forces which the tenant has not wilfully or negligently set in motion. The reason upon which such rulings are grounded is the same as that upon which the surrender cases are based. *Van Wormer v. Crane, supra; Mills v. United States,* 52 Ct. Cl. 452; *Thomas v. Conrad,* 114 Ky. 841, 71 S. W. 903, 74 S. W. 1084.

(3) With respect to clauses granting abatement of rent, the situation is quite different. The rule at common law was that the tenant continued liable for rent in spite of the

total or partial destruction of the building upon the demised premises. The reason for the rule is said to be that since the land remained, the subject matter of the lease had not been destroyed and something remained out of which rent could issue. 1 Tiffany, Landlord and Tenant, p. 1198. This rule, of course, put the risk of destruction from whatever cause upon the tenant, so far as his obligation to pay rent was concerned, and there came to be a general feeling that the rule was inequitable in so far as it obligated the tenant to continue paying rent for the balance of the term when the buildings which he had theretofore occupied under the lease had been destroyed by some sudden, unexpected casualty. It was not considered inequitable that the tenant assume the risk of paying rent for a building on the demised premises which had deteriorated or become unusable merely by gradual action of the elements either alone or in combination with reasonable use of the premises. Dissatisfaction with the common-law rule had two important results. Statutes were enacted in several states including Wisconsin and of which the Wisconsin statutes appears to be a fair sample. Sec. 234.17 Stats., reads as follows:

"Where any building, which is leased or occupied, is destroyed or so injured by the elements, or any other cause as to be untenantable, and unfit for occupancy, and no express agreement to the contrary has been made in writing, the lessee or occupant may, if the destruction or injury occurred without his fault or neglect, quit and surrender possession of the leasehold premises, and of the land so leased or occupied; and he is not liable to pay to the lessor or owner, rent for the time subsequent to the surrender."

This section is of no direct importance in this case for the reason that it provides not for abatement of the rent and continuance of possession by the tenant but for surrender by the tenant as a condition to abatement. It is important, however, to note that this section, which was adopted from

New York, is there construed to apply only in cases where the building has been injured or destroyed by some sudden calamity such as fire, storm, or flood, and not to apply to cases of gradual deterioration, even though this "was principally caused by or contributed by action of the elements." *Suydam v. Jackson,* 54 N. Y. 450; *Huber v. Ryan,* 26 Misc. 428, 56 N. Y. Supp. 135; *Bloomer v. Merrill,* 1 Daly, 485. See also *Hatch v. Stamper,* 42 Conn. 28. The doctrine of these cases may not be applicable to conditions having no relation to the physical impairment of the building but which cause the premises to be uninhabitable for reasons of health or extreme discomfort, but since this matter is of no materiality here, it will not be discussed further. See *Meserole v. Hoyt,* 161 N. Y. 59, 55 N. E. 274; *Tallman v. Murphy,* 120 N. Y. 345, 24 N. E. 716.

The common-law rule also led to the insertion in leases of clauses calling for abatement of rent in about the same terms as the abatement clause here involved. These clauses have generally, and we conclude properly, been construed to deal with sudden catastrophes or calamities, those unexpected events of which a tenant should not be required to carry the risk. Courts have generally declined to apply them to the slow processes of impairment which the rain, wind, heat, and cold over a long period of years gradually accomplished. *Suydam v. Jackson, supra; Harris v. Corlies, Chapman & Drake,* 40 Minn. 106, 41 N. W. 940; *Kirby v. Wylie,* 108 Md. 501, 70 Atl. 213.

Applied to the facts of this case, the foregoing conclusions require reversal of the judgment. The elevator in question is a two-story wooden structure, thirty-two feet by forty feet in area and forty feet high. It is at least twenty years old and probably much older. The evidence is that the wood is rotted and worn from weathering and use over the years, and that the building bulges under a load of coal due to

weakening of the walls. The use of the building was finally prohibited by public authority. The defendant testified that the building had just gradually deteriorated. The evidence gives a typical picture of a building worn out by use and the normal impact of the weather. While there is some suggestion that the condition is due to inherent defect, we think there is no substantial support for this position. While defendant could surrender the building in its present shape at the end of the term without liability for damages because of its condition, and while he has no obligation to reconstruct, he is not entitled to have his rent abated under the clause relied on. His was the risk, in the absence of unexpected casualty, that the building would retain its usefulness for the term.

"The fact, however, that the lease in express terms relieves the tenant from any obligation to restore the building in case of its destruction, does not relieve him from rent in such case, nor does the fact that, in his covenant to yield up the premises at the end of the term, there is an exception in case of destruction by fire or other casualty, have such an effect."

1 Tiffany, Landlord and Tenant, p. 1202. See *Davis v. George,* 67 N. H. 393, 39 Atl. 979; *Ward & May v. Bull & Shine,* 1 Fla. 271; *Monk v. Cooper,* 2 Ld. Raym. 1477.

This determination makes it unnecessary to discuss other questions presented in the briefs.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment for plaintiffs in accordance with the demands of the complaint.

FRITZ, J., dissents.